Victor J. Sandoval (SBN 344461)
**ALMEIDA LAW GROUP LLC**
3415 S. Sepulveda Blvd. Suite 1121
Los Angeles, California 90034
(562) 534-5907
victor@almeidalawgroup.com

*Counsel for Plaintiffs and the Putative Classes*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NICKI APAYDIN *and* STEVEN CHECCHIA, *individually and on behalf of all others similarly situated,*<br><br>Plaintiffs,<br><br>v.<br><br>LOTAME SOLUTIONS, INC.,<br><br>Defendant. | Case No.: 2:26-cv-9478<br><br>**DEMAND FOR JURY TRIAL** |

# CLASS ACTION COMPLAINT

Plaintiffs Nicki Apaydin and Steven Checchia, on behalf of themselves and a class of all others similarly situated, hereby allege the following against Lotame Solutions, Inc. ("Lotame" or "Defendant") based on personal knowledge as to themselves and their own acts, upon due investigation of counsel and, where indicated, upon information and good-faith belief.

## INTRODUCTION

1. Lotame is a global ad-tech and data technology company that provides data management platforms (DMPs), identity resolution solutions, and data collaboration tools for marketers, agencies, and media publishers.

2. As an online data collection company, Lotame uses its suite of web-embedded software to surveil unsuspecting web users and—entirely without their notice or consent—create detailed profiles of them that include demographic information, contact information, browsing data, and other potentially sensitive facts.

3. Lotame sells this highly sensitive data to the highest bidder.

4. Americans do not reasonably expect that the articles they read, the products they research, the purchases they make, and the many other private and sensitive aspects of their online activities will be secretly intercepted by third-party surveillance companies and used to track, profile, and target them.

5. Defendant Lotame engages in and profits from precisely such conduct.

6. Lotame's surveillance infrastructure captures far more than usage or tracking statistics *and involves much more than anonymized data*.

7. Through its "Lightning Tag" JavaScript and "crwdcntrl" tracking pixels, Lotame records the articles users read, the topics they explore, the products they view and purchase, and even their email addresses—granular records of content

consumption and behavior that can reveal users' most sensitive characteristics including, but certainly not limited to, health concerns, financial circumstances, and personal interests.

8. The information collected through Lotame's tracking technology—including page views, content metadata, click and event activity, email addresses, and behavioral signals—is fed into Lotame's proprietary identity graph and its "Panorama ID" cross-device identifier, which resolves the identities of individual consumers and tracks them across the internet.

9. Lotame uses its proprietary Panorama ID identity graph to resolve these intercepted communications to the identities of individuals, enabling persistent cross-device tracking and surveillance by connecting a user's desktop, mobile, and connected-television devices to a single persona.

10. Lotame then sells this identity-resolved data throughout the advertising ecosystem—to ad servers, demand-side platforms ("DSPs"), supply-side platforms ("SSPs"), ad networks, ad exchanges, and other data buyers—enabling those parties to target advertisements to consumers based on their intercepted browsing and purchasing activity.

11. Lotame allows website operators to deploy tracking code on websites that automatically captures information communicated by users, including the URLs and metadata of the pages they visit, revealing their behaviors and interests, form inputs including email addresses, and event-level interactions, and transmits that information to Lotame's servers at its "crwdcntrl.net" collection domains.

12. Lotame provides its tracking technology and data-management platform to website operators so that they can collect, organize, and monetize their own audience data, and aggregates the data it intercepts across its network of websites into its cross-site identity graph and Panorama ID, selling and sharing the

resulting identity-resolved consumer profiles with advertising platforms and data buyers for its own commercial benefit.[1]

13. Lotame's identity graph then links this intercepted information across devices and sessions, creating a persistent identity profile that allows Lotame and its customers to track and target individuals based on their browsing activity, content consumption, and personal characteristics.

14. Lotame markets its Panorama ID as a cross-platform identifier that tracks users across their desktop, mobile, and connected TV devices to create an individual persona.[2]

15. This identity-resolved data is used by third parties to target advertising to individuals based on their personal information, browsing behavior, and content consumption.[3]

---

[1] *The Hard and Fast Rules of Data Collection*, https://www.lotame.com/resources/the-hard-and-fast-rules-of-data-collection/ (last visited July 24, 2026) (describing the types of data that Lotame can collect, noting that "Through our DCP, you can seamlessly collect numerous data points per page, including: Click[,] Downloads[,] Ad interactions[,]Commenting[,] Newsletter sign-ups[,]Types of media being consumed[,]Search terms being entered[,]Forum posts and topics."); LT.js *Detailed Reference Guide*, https://my.lotame.com/t/g9hxvnw/lt-js-detailed-reference-guide (last visited July 24, 2026).

[2] *Lotame Unveils Panorama ID, the First Global Cookieless Identity Solution for a Privacy-First Open Web, Lotame* (Oct. 28, 2020), https://www.lotame.com/resources/lotame-unveils-panorama-id-the-first-global-cookieless-identity-solution-for-a-privacy-first-open-web/ (last visited July 24, 2026).

[3] *LT.js Google Ad Manager Guide*, https://my.lotame.com/t/m1hh37x/lt-js-google-ad-manager-guide (last visited July 24, 2026); *Server-to-Server Technical Specs (Outbound from Spherical)*, https://my.lotame.com/t/60h6k4l/server-to-server-technical-specs-outbound-from-spherical-batch-file-processing (last visited July 24,

16. All of this is done without consumers' consent or awareness.

17. The breadth and sophistication of Lotame's tracking technology prevents typical consumers from knowing that Lotame is intercepting and using their sensitive communications for commercial purposes.

18. Simply put, consumers do not consent to having their personal information intercepted by a third-party data-surveillance company merely by reading an article, browsing a website, or making a purchase online.

19. Plaintiffs are individuals whose electronic communications were intercepted by Lotame's tracking code without their knowledge or consent.

20. Plaintiff Apaydin visited the website saksfifthavenue.com, among other websites where Lotame intercepted her information, and Plaintiff Checchia visited the websites dicks.com and kohls.com, among other websites where Lotame intercepted his information.

21. For both Plaintiffs—along with countless unwitting consumers across the country—the Lotame tracking code was deployed on websites where they unsuspectingly browsed and shopped.

22. As a result, their personal and private information was intercepted and used to compile robust consumer profiles; the data collected includes their email addresses, browsing activity, content-consumption data, and interactions with the websites.

23. Lotame, through its identity graph and Panorama ID, uses this data in conjunction with other identifiable data collected from the user to create and

---

2026); Instructions for SSPs Adopting the Panorama ID in the Bidstream, https://my.lotame.com/t/y4hjvdv/instructions-for-ssps-adopting-the-panorma-id-in-the-bidstream (last visited July 24, 2026).

constantly augment persistent identity profiles that map onto specific web users.

24. As more fully described below, neither Plaintiff was aware of Lotame's presence on these websites, and neither consented to the interception of their communications.

25. Plaintiffs bring this class action lawsuit on behalf of themselves and the putative Classes defined below to, among other things, enforce their fundamental privacy rights, obtain corrective change to Lotame's unlawful business model and to obtain redress for the financial, dignitary, and relational harms Lotame has caused.

26. Plaintiffs assert representative claims for: (i) violations of the Electronic Communications Privacy Act, 18 U.S.C. § 2510, et seq.; (ii) invasion of privacy under the California Constitution, Art. I, § 1; (iii) intrusion upon seclusion; (iv) violations of the California Invasion of Privacy Act, Cal. Penal Code § 631; (v) violations of the California Invasion of Privacy Act, Cal. Penal Code § 632; (vi) violations of the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. C.S. § 5701, *et seq.*; and (vii) unjust enrichment.

**PARTIES**

27. Plaintiff Nicki Apaydin is, and at all relevant times has been, a resident of Marina Del Rey, California.

28. Plaintiff Steven Checchia is, and at all relevant times has been, a resident of Aston, Pennsylvania.

29. Defendant Lotame Solutions, Inc. is a corporation incorporated under the laws of State of Delaware with a principal place of business located at 8890 McGaw Road, Suite 250 in Columbia, Maryland 21045.

30. Founded in 2006, Lotame operates one of the world's largest data management platforms and cross-device identity graphs.

31. In 2025, Lotame was acquired by Publicis Groupe and now operates as

part of Epsilon, Publicis's data and identity division.

## JURISDICTION AND VENUE

32. This Court has jurisdiction over the subject matter of this case under 28 U.S.C. § 1331 because it arises under the laws of the United States and under 28 U.S.C. § 1367 because Plaintiffs' nonfederal claims share a common nucleus of operative fact with their federal claims.

33. This Court also has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because (a) this is a class action lawsuit in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; (b) there are more than 100 members of the proposed class; and (c) at least one member of the proposed class, including Plaintiffs, is a citizen of a state different from Defendant.

34. This Court has personal jurisdiction over Lotame because Lotame purposefully directed its conduct at California, deploying its tracking technology on websites accessed by California residents, including Plaintiff Apaydin, and intercepting the communications of Plaintiff Apaydin and California Class members while they were located in California and in this judicial district, and because Lotame conducts substantial business in California.

35. Venue lies in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district, including Lotame's interception of Plaintiff Apaydin's communications while she was located in this District.

## FACTUAL BACKGROUND

### A. LOTAME DEPLOYS TRACKING TECHNOLOGY TO INTERCEPT AND COLLECT VAST AMOUNTS OF CONSUMER DATA.

36. Lotame was founded in 2006 and is one of the longest-running data

management platforms in the advertising-technology industry.

37. Lotame's current platform is branded "Spherical" and its longstanding "Crowd Control" brand survives as the domain on which Lotame's data-collection infrastructure runs: "crwdcntrl.net."[4]

38. In March 2025, Publicis Groupe announced its acquisition of Lotame, and the acquisition closed shortly thereafter.

39. Lotame now operates as part of Epsilon, Publicis's data and identity unit.

40. Publicis stated that incorporating Lotame into Epsilon would allow it to reach 91% of adult internet users worldwide and access approximately four billion customer profiles.[5]

41. Lotame's clients include major publishers, consumer brands, agencies, and data brokers across 109 countries. Lotame markets its ability to collect consumer data at scale, organize that data into audience segments, and activate those segments

---

[4] *Data Collection with Lightning Tag,* https://my.lotame.com/category/lightning-tag (last visited July 24, 2026) ("Spherical"); *LT.js Basic Implementation*, https://my.lotame.com/t/83hxvnt/lt-js-basic-implementation (last visited July 24, 2026) (crwdcntrl.net collection domains); *Lotame's Crowd Control® is Enhanced by The Media Trust to Provide Industry's Most Advanced Data Protection Solution*, PR Newswire (Feb. 26, 2013), https://www.prnewswire.com/news-releases/lotames-crowd-control-is-enhanced-by-the-media-trust-to-provide-industrys-most-advanced-data-protection-solution-193271101.html (last visited July 24, 2026) ("Crowd Control®, the company's feature-rich data management platform").

[5] *Publicis to Acquire Lotame, the World's Leading Independent End-to-End Data Solution* (Mar. 6, 2025), https://www.publicisgroupe.com/en/news/press-releases/publicis-to-acquire-lotame-the-world-s-leading-independent-end-to-end-data-solution (last visited July 24, 2026).

across the advertising ecosystem.[6]

42. Each tracked page view and website visit generates data that flows into Lotame's identity graph, enabling persistent surveillance and identity resolution across millions of consumers.

43. Lotame's client-side data collection is performed by two related technologies bundled under the "crwdcntrl" label: (i) a JavaScript tag known as the "Lightning Tag" (or "LT.js"), loaded from Lotame's servers at "tags.crwdcntrl.net," which runs data collection and audience targeting in the user's browser; and (ii) code implemented on consumer-facing websites that connects to Lotame endpoints such as "bcp.crwdcntrl.net" and are used for click tracking and third-party syncing.[7]

44. Per Lotame's own documentation, the Lightning Tag "facilitates all Spherical platform operations". In its basic form, the tag will "execute data collection rules" configured with a Lotame account representative, deploy subscribed sync pixels, and deploy export beacons.[8]

45. Lotame captures the user's interactions with each website and appends the collected data to a persistent identity profile which matches individuals across websites either by collecting personal identifiers and specific browsing and input data including:

a. The URLs and metadata of pages visited—including article titles, tags, and authors—which reveal sensitive information about the content being viewed;

---

[6] *Id.*

[7] *LT.js Basic Implementation, supra,* n.4; *see also Lotame Pixels*, https://adtech.dev/data/data-management-platform/lotame-pixels/ (last visited July 24, 2026) (pixel tags used for click tracking and third-party syncing).

[8] *LT.js Basic Implementation, supra,* n.4.

b. Behavioral data, including interests, media consumption, and actions taken on the page;

c. Email addresses entered by users, captured through the tag's setIdentity() method in plain-text or SHA-256 hashed form;

d. Third-party identifiers that tie a partner's own user ID to the Lotame profile;

e. Persistent cookies and device identifiers, including mobile advertising IDs and connected-television (CTV) device IDs;

f. IP addresses, user-agent strings, and timestamps;

g. Event-level interactions captured through the tag's collect() method, which batches and transmits an ongoing stream of in-page activity—such as a user's interactions with a video player—roughly every second.[9]

46. Lotame also scrapes the contents of the pages a user views, "pulling in new values based on the page contents" without each value being passed by the website.[10]

47. Records of the articles a person reads and the products a person researches are records of that person's thoughts. When consumers read about a medical condition, a financial hardship, a pregnancy, an addiction, or a religious or political topic, they do so with a reasonable expectation that no third party is recording that activity and appending it to a persistent, identity-resolved dossier.

---

[9] *LT.js Detailed Reference Guide, supra,* n.1*; Lotame Panorama ID for Header Bidding*, Prebid.org, https://docs.prebid.org/dev-docs/modules/userid-submodules/lotame.html (last visited July 24, 2026) (IP address, user agent, and timestamp); *see also Lotame Pixels, supra,* n.6 (cookies and click trackers).

[10] *LT.js Detailed Reference Guide*, *supra,* n.1.

48. Lotame's interception of this content-consumption data, and its retransmission of identity-resolved audience segments to advertising platforms and data buyers, is precisely the type of unauthorized collection and disclosure that consumers expect to be prohibited.

49. Collection of this data constitutes the interception of the contents of sensitive communications.

50. The articles a user reads often correspond to the user's health conditions, finances, or other private concerns; behavioral and event-level data often reflect answers to questions, product selections, and other substantive interactions. Identifiers entered on these pages, like email addresses and full names, are captured in plain text and used by Lotame to directly identify users.




## B. Lotame's Panorama ID and Identity Graph Enable Cross-Device Identity Resolution.

### i. <u>Lotame Identifies and Surveils Web Users Through a Multifaceted Tracking Scheme that Operates Across Many Websites.</u>

51. At the core of Lotame's surveillance capabilities is its proprietary identity graph and its "Panorama ID," a cross-device identifier that links together multiple devices and identifiers to create a unified profile of individual consumers.

//

52. The Panorama ID relies on statistical inference, drawing on signals such as device type, IP address, and behavioral patterns to resolve fragmented identity data into a single consumer profile.[11]

53. Lotame's documentation reveals exactly what a consumer profile contains.

54. When the Lightning Tag finishes processing a page view, it returns a "profile" object whose documented methods include: "getProfileId()"—the "Profile ID" (PID) associated with the user's browser, which is the spine of the record; "getPanorama()"—the user's Panorama ID, which is either an "Individual-Based" ID that connects "multiple devices (desktop, mobile, CTV, etc) to a single individiual [*sic*] persona" or a "Device-Based" ID tied to a single browser or device; "getThirdParty()"—third-party identifiers associated with the Profile ID; and "getAudiences()"—the list of audience segments into which Lotame has classified the user.[12]

55. Lotame does not require a consumer to provide their name or email address to track them, but if a customer provides that information on a webpage where Lotame's trackers are running, it is captured and included in an individual's Panorama ID (as explained in more depth below).

56. Where such identifiers are unavailable, Lotame's probabilistic matching silently analyzes device characteristics, network attributes such as IP

[11] *Lotame Panorama ID for Header Bidding, Prebid.org, supra,* n.8.

[12] *LT.js Detailed Reference Guide*, *supra,* n.1.

address, and behavioral signals to uniquely identify site users and infer that distinct interactions across devices originate from the same person.[13]

57. When a consumer enters their email address on a website where Lotame's tag is installed—for example, to sign up for a newsletter or create an account—the tag's setIdentity() method captures that email address in plain-text or hashed form, and Lotame can deterministically link that session to any other session across its network where the same email address was provided, creating a unified view of that consumer's browsing activity across the internet.

58. This allows Lotame to follow a consumer across their devices and platforms without their awareness. Mobile browsing, desktop activity, and connected-television viewing are linked through IP addresses, identifiers, and behavioral patterns, assembling a cross-device profile that persists and expands over time—even for consumers who have never volunteered a single piece of identifying information.

59. Lotame also identifies users by setting persistent cookies on visitors' browsers via its crwdcntrl.net domain.

60. Third-party documentation identifies cookies including "_cc_id," which stores the user's Lotame identifier; "_cc_aud," which collects and stores "Lotame audience data"; and "_cc_cc," which collects session data related to "the user's website visits, such as the number of visits, average time spent on the website

---

[13] *Mastering Identity Resolution Strategy: How Brands Can Connect Data Without Losing Control (Aug. 15, 2025), https*://www.lotame.com/resources/mastering-identity-resolution-strategy/ (last visited July 24, 2026); *see also* Lotame Panorama ID for Header Bidding, Prebid.org, *supra*, n.8 (Panorama ID graph built on hashed emails and browser and device data; module sends IP address, user agent, and timestamp).

and what pages have been loaded."[14]

61. Lotame's identity graph is continuously enriched server-side. Lotame's inbound documentation describes sending "sightings" data to Lotame's graph so that user IDs "can be connected to the Lotame Panorama ID," and sending userID-to-third-party-ID mappings so Lotame can "connect [a] Third-Party ID to data in [the] Lotame Graph" to enhance the details retrievable on that ID. This process turns the pseudonymous browser cookie into a durable, cross-site, cross-device persona.[15]

62. Thus, through its suite of pixels, a consumer who visits a website with Lotame's tag installed will be identified. Collected behaviors, interests, media consumption, content metadata, and any captured email address resolve to a Profile ID Lotame maintains.

63. This is linked into the Panorama ID identity graph, joining a single person's many devices and IDs. The user's profile is scored against segment rules; and the user "qualifies" for a set of audience segments, whose IDs are written to the user's browser and made available to advertising systems.

ii. <u>Lotame's Tracking Defaults to Collection and Renders Consumers' Privacy Controls Ineffective.</u>

64. The Lotame tracking code is loaded from Lotame's own servers using a unique client identifier assigned to each website operator: the Lightning Tag is retrieved from the embedded URL "https://tags.crwdcntrl.net/lt/c/<client ID>/lt.min.js," executes invisibly in the visitor's browser, and transmits detailed

---

[14] *Lotame Cookies,* https://adtech.dev/data/data-management-platform/lotame-cookies/ (last visited July 24, 2026*); Lotame Pixels, supra,* n.6.

[15] *Inbound to Spherical (Overview)*, https://my.lotame.com/t/g9yhnth/overview (last visited July 24, 2026).

tracking data to Lotame's collection servers.[16]

65. Lotame instructs website operators to add "preconnect" and "dns-prefetch" tags to Lotame's collection domains—"tags.crwdcntrl.net," "bcp.crwdcntrl.net," and "c.ltmsphrcl.net"—to the head of every page so that the tracking infrastructure loads simultaneously with the page load.[17]

66. By default, the Lightning Tag begins collecting data as soon as it loads. Lotame's documentation provides an "autoRun" configuration option that can be set to false, specifically so that a website operator can obtain "the customer's consent" before "enabling the data collection and targeting" to run—confirming that, absent that affirmative operator-side configuration, the tag collects data without waiting for anyone's consent.[18]

67. Lotame will only disable its tracking and interception technology on a given webpage if it receives a signal from the website that a consumer has not provided consent.

68. As such, given that the default on the Lightning Tag is to begin collecting data as soon as it loads, Lotame never seeks consumer consent and defers the obligation to obtain consumer consent to the website owner, even though it is Lotame collecting a host of sensitive data from the consumer.[19]

---

[16] *LT.js Implementation FAQs*, https://my.lotame.com/t/35hxvna/lt-js-implementation-faqs (last visited July 24, 2026).

[17] *LT.js Basic Implementation, supra,* n.4.

[18] *LT.js Detailed Reference Guide, supra,* n.1 (autoRun parameter); *see also LT.js Active Consent Guide*, https://my.lotame.com/t/p8ytnf4/lt-js-active-consent-guide (last visited July 24, 2026).

[19] *LT.js Detailed Reference Guide, supra,* n.1.

69. Lotame's privacy controls are thus illusory from the consumer's perspective: the consumer has no relationship with Lotame, no notice that the Lightning Tag is running, and no mechanism to communicate a refusal directly to Lotame.

70. A consumer's browser-level privacy preferences are honored only if each of the many website operators deploying Lotame's tag has separately and correctly configured the tag to pass those preferences through, and even more fundamentally if the website operators themselves seek user consent for the type of information Lotame tracks and collects.

71. The vast majority of websites deploying Lotame's tag do not configure these optional consent controls, with the result that Lotame collects data from consumers, including consumers who have activated browser privacy signals, by default.

72. Even a consumer who inspected their browser's network activity would have no practical way of understanding that calls to "bcp.crwdcntrl.net", "sync.crwdntrl.net", or any of Lotame's domains represent a third-party data management platform intercepting their communications, resolving their identity, and packaging them into audience segments for sale.

73. Lotame uses its tracking code as a window into unsuspecting website visitors' activity, operating as a means of continuous surveillance to create a record that Lotame ultimately monetizes through its data marketplace and audience-activation products.

iii. <u>Lotame's Tracking Technology Intercepts and Records Data From Users Across the Web.</u>

74. The defining network signature of Lotame's platform is a call to a Lotame collection endpoint, which sends collected data to Lotame and returns

targeting and profile information.

75. Each such call carries the data object documented in Lotame's reference guides, including behaviors, content metadata, identity data, and third-party identifiers, along with the standard information any web request conveys: the user's IP address, user-agent, referring page, and timestamp.[20]

76. Lotame also uses traditional "pixel" tracking to capture consumer data, implementing a 1×1 image pixel pointing at "bcp.crwdcntrl.net" with client ("c=") and placement/behavior ("b=") parameters.

77. For click tracking, the HTML wrapper is stripped so that the URL itself records the click server-side and then redirects the user to their destination.

78. The purpose of this mechanism, as described in industry documentation, is to track visitors across websites in order to display advertisements relevant to the individual user.[21]

79. The data captured through Lotame's tag will often include highly sensitive personally identifiable information.

80. Lotame's documentation confirms that the tag's setIdentity() method captures "user-identifiable info"—currently email, in plain-text ("EMAIL") or SHA-256-hashed ("EMAIL_SHA256") form—and that Lotame encrypts and stores all values passed to setIdentity() in its "Identity Vault."

81. An email address is a durable, immutable identifier: once captured, it permanently links the user's pseudonymous browsing profile to their real-world

---

[20] *LT.js Detailed Reference Guide, supra*, n.1 (data object); *see also LT.js Implementation FAQs*, *supra,* n.15.

[21] *Lotame Pixels, supra,* n.6.

identity.[22]

82. Lotame's product is designed to individually identify consumers and classify them by their interests and behaviors.

83. The tag's documented example fields include site sections, traffic sources, and article categories such as "politics," and its "ruleBuilder" fields capture article tags such as "food," article titles, and article authors—category flags that, depending on the content a user consumes, can reveal the user's health concerns, financial circumstances, political and religious views, and other sensitive characteristics.[23]

84. In addition to capturing page views and identity data, Lotame's tag is designed to capture and record user interactions over time.

85. The tag's collect() method allows websites to pass event-level data to Lotame's platform after the JavaScript is loaded, for tracking events.

86. Lotame deploys this standardized collection method across its network of customer websites and provides each website operator with the same Lightning Tag JavaScript, which is loaded from the same tags.crwdcntrl.net endpoint and differentiated only by a unique client identifier embedded in the tag URL.[24]

87. Through the simultaneous use of these methods, Lotame captures sensitive data directly in web users' browsers and transmits their communications to Lotame's collection endpoints contemporaneously with the user's intended

---

[22] *LT.js Detailed Reference Guide*, *supra,* n.1.

[23] *Id.*; *see also LT.js Data Collection Guide*, https://my.lotame.com/t/p8hxvnd/lt-js-data-collection-guide (last visited July 24, 2026).

[24] *LT.js Detailed Reference Guide*, *supra,* n.1; *LT.js Implementation FAQs, supra*, n.15.

communication with the website.[25]

88. Whatever the user browses, reads, clicks, or submits to the website is simultaneously captured and redirected to Lotame's servers in real time.

89. Each deployment of Lotame's identity resolution technologies, as detailed *supra*, transmits data to Lotame's servers and facilitates the same data-collection, profile-extraction, and pixel-firing modes.[26]

90. The operation of the Lotame tag on any one website in its network is therefore illustrative of how the tag operates on all websites across Lotame's network, including saksfifthavenue.com, kohls.com, and dicks.com.

91. Neither the websites identified above nor, do most or any third-party website that deploys Lotame's tag disclose to users Lotame's cross-device identity resolution, data aggregation, audience classification, or distribution of user data to advertising platforms and data buyers.

92. Users who visited these websites, or any website where Lotame was active, and read content or entered their personal information were therefore unaware that their communications were being simultaneously intercepted and transmitted to Lotame's servers.

### C. LOTAME SHARES CONSUMER DATA WITH ADVERTISING PLATFORMS AND DATA BUYERS.

93. Lotame's documentation describes three distinct mechanisms by which the consumer profiles Lotame builds are distributed into the advertising ecosystem.

94. First, Lotame's tag Lightning Tag passes audiences directly into the

---

[25] *Id.*

[26] *Id.*

website's advertising calls: Lotame's Google Ad Manager guide describes using the Lightning Tag to push "audiences, Panorama ID and Profiles IDs" to Google Ad Manager for targeting, with the user's audience segment IDs attached to the ad request. The same pattern generalizes to any ad server or supply-side platform.[27]

95. Lotame's tag fires third-party pixels from the user's browser. Lotame's data collection documentation states that page processing includes "3rd party pixel (sync pixels and export beacons) firing."[28]

96. Sync pixels perform cookie-matching: they let a partner map its own user ID to the Lotame ID so the two systems can recognize the same person later. Export beacons push data out to subscribed destinations as the page loads. Information intercepted by Lotame's tracking code is thus transmitted to third-party advertising companies in real time, as the consumer browses.[29]

97. Third, Lotame delivers consumer profiles server-to-server. Lotame's "Outbound from Spherical" specifications describe delivering audience files to third parties via AWS S3, in files pairing each user ID with the list of audience segments to which the user belongs.

98. Critically, the identifiers in those files are not limited to cookies: Lotame's specifications state that Lotame Profile IDs ("PID"), Third Party IDs ("TPID"), Mobile Advertising Device IDs, and connected-television ("CTV") IDs can be combined or delivered in separate files, with CTV files further splitable by

---

[27] *LT.js Google Ad Manager Guide*, *supra,* n.3.

[28] *LT.js Data Collection Guide, supra*, n. 22

[29] *Id.*

device type (Roku, Apple TV, etc.)[30]

99. Delivery can be "comprehensive"—the user's complete list of audiences each time—or "incremental," updating whenever an ID qualifies for a new audience or on a periodic refresh. This outbound flow is what physically moves consumer profiles to DSPs, SSPs, ad networks, exchanges, and other data buyers for media activation.[31]

100. Lotame's relationships with advertising platforms confirm that those platforms are active collaborators in Lotame's surveillance infrastructure.

101. The platforms provide Lotame with technical specifications for data formatting, delivery, and ID syncing; Lotame provides the platforms with identity-resolved consumer profiles enriched with browsing and content-consumption behavior from across its network.

102. This collaboration amplifies the privacy harm to consumers, whose personal information becomes embedded in advertising systems designed to exploit that information for commercial purposes.

## D. Lotame Is a Third-Party Eavesdropper, Not an Extension of Website Operators.

103. Lotame is not a mere extension or agent of the website operators who deploy its tracking code, but an independent third-party eavesdropper with its own commercial interests in the data it intercepts.

### i. Website Operators Deploy Lotame to Collect, Enrich, and Monetize Their Own Data.

---

[30] *Server-to-Server Technical Specs (Outbound from Spherical)*, *supra*, n. 3.

[31] *Id.*

104. Website operators embed Lotame's "Lightning Tag" tracking code into their websites to collect and consolidate their own first-party data about site visitors into a single, unified customer profile, which Lotame's Spherical platform then enriches with additional demographic, behavioral, and interest attributes drawn from Lotame's data marketplace.[32]

105. Using Lotame's platform, website operators build audience segments, obtain insights about the people who visit their properties, and improve the targeting and measured performance of the advertising they sell against their own inventory.[33]

106. Website operators also use Lotame to monetize visitor data directly: through Lotame's "Spherical Data Seller" offering, a publisher can package its first-party audience segments and permission or sell them to marketers and agencies, converting data about its own visitors into an additional stream of advertising revenue.[34]

ii. Lotame Independently Exploits the Intercepted Data for Its Own Commercial Benefit.

107. Unlike a simple analytics tool that processes data solely for the benefit

---

[32] *See Spherical Data Collaboration Platform*, https://www.lotame.com/products/spherical-platform/ (last visited July 24, 2026); Lotame, Identity Resolution and Activation, https://www.lotame.com/capabilities/identity-resolution-activation/ (last visited July 24, 2026).

[33] *See Lotame, Audience Insights*, https://www.lotame.com/capabilities/audience-insights/ (last visited July 24, 2026).

[34] *See Lotame, Data Monetization for Publishers (Spherical Data Seller)*, https://www.lotame.com/capabilities/revenue-monetization/ (last visited July 24, 2026).

of a single website operator, Lotame aggregates and links user data across its entire network of client websites through its identity graph and Panorama ID.

108. When a consumer visits saksfifthavenue.com, for example, Lotame does not merely analyze that interaction for saksfifthavenue.com's benefit but links that interaction to the consumer's browsing history on every other Lotame-tracked website, creating a unified identity profile that no individual website operator could construct and that serves Lotame's independent commercial interest in building a comprehensive surveillance infrastructure.

109. Lotame integrates with ad servers, among other data sources, for inbound and outbound data transfer including the transfer of data to ad exchanges to match third-party data to audience segments and the transfer of data to ad networks and exchanges for media buys.

110. Lotame transmits identity-resolved consumer data to these third parties pursuant to commercial arrangements Lotame has established with them.[35]

111. These arrangements serve Lotame's independent business interests—enhancing its product offering, strengthening its market position, and generating value through data-sharing arrangements—not merely the interests of the website operators whose users' data is transmitted.

112. A website operator deploying Lotame's tag does not control, and may not even be aware of, the data flows from Lotame to advertising platforms and data brokers through Lotame's sync pixels, export beacons, and outbound batch transfers.

---

[35] *Outbound from Spherical*, https://my.lotame.com/category/outbound-from-spherical (last visited July 24, 2026); *Lotame Spherical Platform, LiveRamp Partner Directory*, https://partner-directory.liveramp.com/partners/lotame-spherical-platform (last visited July 24, 2026) ("Connect with leading SSPs, DSPs, ad servers, social platforms, CDPs, personalization platforms and more").

113. Website operators deploying Lotame's tracking code do not exercise meaningful control over Lotame's collection, retention, and use of the data Lotame intercepts.

114. Lotame independently determines: (a) the technical specifications of its tracking code and what data it captures; (b) how long intercepted data is retained in Lotame's systems; (c) how the Panorama ID identity graph links users across Lotame's client network; (d) which third parties receive data through sync pixels, export beacons, and outbound transfers; and (e) what security measures protect intercepted data.

115. Lotame also derives independent commercial benefit from the data it intercepts beyond providing services to individual website operators. Lotame's identity graph and Panorama ID are built from aggregated consumer data collected across all of Lotame's client websites.

116. Each consumer interaction Lotame intercepts enhances the accuracy and comprehensiveness of the identity graph, increasing Lotame's ability to resolve identities, improving its audience segments, and enabling Lotame to charge premium prices for its data products.

117. This accumulation of data assets for Lotame's independent commercial benefit distinguishes Lotame from a mere analytics tool operating solely for the benefit of website operators.

118. Lotame's own documentation confirms that the data it collects becomes an asset of Lotame's platform. Data collected through the Lightning Tag is passed to Lotame's Spherical Platform "for use in targeting or other features," resolved into Lotame-owned identifiers, and stored in Lotame's systems—including the "Identity Vault" in which Lotame stores captured email identifiers. Lotame, not the website

operator, controls these systems.[36]

119. Lotame's commercial offering further demonstrates the independent benefit it derives from interception. Lotame operates one of the largest data marketplaces in the world—the Lotame Data Exchange—through which audience data collected across its network is packaged and made available to advertisers and platforms.

120. Lotame also markets its Panorama ID as freely accessible to digital advertising players across the ecosystem, seeding its identifier throughout the advertising industry to entrench its identity graph as common infrastructure.[37]

121. Lotame describes its own business in terms that leave no ambiguity about the commercial value it derives from consumer data: Lotame markets itself as the "#1 independent global data and identity solution," built on more than 1.6 billion IDs and more than 100 data sources, and home to "one of the largest end-to-end data marketplaces in the world."[38]

122. In announcing its acquisition of Lotame, Publicis Groupe likewise emphasized that the value of the transaction lay in Lotame's data assets: combining

---

[36] *LT.js Detailed Reference Guide*, *supra,* n.1.

[37] *Publishers Choose Lotame Panorama ID™ As One of the Top Adopted Cookieless ID Solutions* (Dec. 8, 2023), https://www.lotame.com/resources/lotame-panorama-id-one-of-top-adopted-cookieless-id-solutions/ (last visited July 24, 2026); *Back to Basics: How Does a Data Exchange Work?*, Lotame, https://www.lotame.com/resources/back-basics-data-exchange-work/ (last visited July 24, 2026) (Lotame Data Exchange is "among the largest exchanges globally"); Lotame Unveils Panorama ID, *supra*, n.2 (Panorama ID is "freely accessible to all digital advertising players").

[38] *Publicis to Acquire Lotame, the World's Leading Independent End-to-End Data Solution*, *supra*, n. 5.

Lotame's identity graph with Epsilon's would allow Publicis clients to see and engage with "91% of all adults who use the internet." [39]

123. These statements confirm that Lotame's identity graph—built from data intercepted through its tracking technology deployed across thousands of websites—is the core commercial asset of the company, not a byproduct of an analytics service.

## E. Lotame Never Obtained Effective Consent to Its Data Gathering Practices.

124. Lotame conducts its surveillance practices within a context and in a manner where consent from the persons whose data it intercepts does not in fact occur, and could not be enforced as a matter of law given the lack of adequate disclosure and the extent of the privacy rights that are violated.

125. Plaintiffs and Class members have no direct relationship with Lotame.

126. They do not knowingly interact with Lotame's services or visit Lotame's website. Lotame's tracking code operates invisibly in the background, intercepting communications.

127. Lotame never directly obtains consent from the persons whose data it intercepts.

128. Consumers reading the news, researching products, or browsing the web reasonably expect their interactions to remain between themselves and the website they are visiting; they do not expect that a third-party data management platform is intercepting their activity and appending it to a persistent, identity-resolved profile.

---

[39] *Id.*

129. Furthermore, most if not all of the websites deploying Lotame's tracking code do not adequately inform users that Lotame is independently collecting their data and constructing persistent personal profiles through its Panorama ID identity graph.

130. Lotame itself also obtains no consent from the consumers whose data it intercepts. Lotame has no direct relationship with website visitors and provides no notice to them that it is collecting their communications, browsing behavior, form inputs, and other sensitive information.

131. Lotame does not present consumers with an opportunity to opt out of its identity graph or to prevent their data from being shared with advertising platforms and data buyers through Lotame's sync pixels, export beacons, and outbound batch transfers.

132. Lotame operates entirely in the shadows, intercepting consumer data without the knowledge or authorization of the individuals whose privacy it invades.

133. The information asymmetry between Lotame and the consumers whose data it intercepts makes genuine consent practically unattainable.

134. Lotame's tracking operates invisibly, under a domain name—"crwdcntrl.net"—that no reasonable consumer would associate with a data management platform, and website operators have every incentive not to highlight a third party's surveillance of their users.

135. Lotame encourages and facilitates this non-disclosure by designing its tracking infrastructure to be invisible to consumers.

136. Lotame possesses complete knowledge of its tracking code's capabilities, the data it collects, how its identity graph resolves identities, and which third parties receive consumer data through its distribution channels.

137. Consumers, by contrast, cannot reasonably observe Lotame's tag

executing in their browsers, inspect the data payloads transmitted to Lotame's servers, or discover that their personal information has been linked to a persistent identity profile and distributed to advertising platforms and data buyers.

138. This asymmetry is fundamental to Lotame's business model. Consumers overwhelmingly object to being tracked across the web and, when aware of such tracking, take affirmative steps—disabling cookies, installing ad blockers, and disengaging from brands that track them—to avoid the very surveillance Lotame conducts.[40]

139. Lotame's tracking is nonetheless designed to operate without consumers' knowledge or meaningful consent.

140. The complexity of Lotame's technical infrastructure, which involves persistent cookies, deterministic and probabilistic identity matching, server-side graph enrichment, automatic page scraping through its Optimus rules engine, and real-time and batch data sharing with multiple advertising platforms, demonstrates that Lotame's tracking is engineered to operate beyond the visibility of reasonable consumers, rather than through any transparent, consent-based framework.

---

[40] *See, e.g.*, *GumGum, Consumers Say No to Data Tracking*, https://gumgum.com/blog/consumers-say-no-to-data-tracking (last visited July 24, 2026) (62% of consumers uncomfortable with online tracking; 38% have installed ad blockers); Pew Research Center (May 2023) (67% of U.S. adults turn off cookies or website tracking to protect their privacy), as reported in ANA, Privacy, Data, and Consent: Consumer Attitudes (Dec. 2023), https://www.ana.net/miccontent/show/id/aa-2023-12-consumer-privacy (last visited July 24, 2026); Joseph Turow et al., Univ. of Pa. Annenberg Sch. for Commc'n, Americans Don't Understand What Companies Can Do With Their Personal Data (2023), https://www.asc.upenn.edu/news-events/news/americans-dont-understand-what-companies-can-do-their-personal-data-and-thats-problem (last visited July 24, 2026).

141. Moreover, Lotame's privacy controls default to collection and depend entirely on website operators. Data collection begins as soon as the tag loads unless the operator has affirmatively configured it otherwise; the Global Privacy Control signal by which consumers communicate a refusal to be tracked is honored only if the operator separately passes that signal through to Lotame; and consumers who have taken affirmative steps to limit tracking have no way to verify—and no reason to believe—that each website they visit has correctly configured Lotame's optional consent controls.[41]

142. Because Lotame's tracking infrastructure collects by default and provides consumers neither notice of their practices nor direct means of refusal, Lotame cannot credibly claim that consumers have consented to its tracking.

143. Consumers who have activated browser privacy signals have communicated a clear preference not to be tracked, yet whether that preference has any effect depends entirely on configuration choices those consumers cannot see.

### F. REPRESENTATIVE PLAINTIFFS' EXPERIENCES.

#### i. Plaintiff Apaydin.

144. As recently as June 2026, Plaintiff Nicki Apaydin visited the website saksfifthavenue.com, a website that deploys Lotame's tracking technology, including its "Crowd Control" (crwdcntrl) tracking pixel. Saksfifthavenue.com is the direct-to-consumer e-commerce website of Saks Fifth Avenue, a luxury department store retailer.

145. Plaintiff Apaydin used the saksfifthavenue.com website beginning in or around 2020 to browse and purchase products since that time, including orders

[41] *LT.js Active Consent Guide*, *supra,* n.17.

placed on or around April 7, 2024 and July 10, 2024.

146. During these visits, the website invited Plaintiff Apaydin to communicate personal information to it, and Plaintiff Apaydin did so, including:

a. Plaintiff's name, address, and other personal information, entered to create her account and to place orders;

b. The articles, products, and other content Plaintiff viewed, including page titles, tags, and categories;

c. Plaintiff's payment information and shipping history, communicated in connection with her orders on the website; and

d. Click activity and other interactions with the website's pages.

147. When Plaintiff Apaydin visited saksfifthavenue.com and communicated this personal information, Lotame's Lightning Tag was present on the website and intercepted the contents of Plaintiff's communications with the website.

148. Lotame's identity graph then used the intercepted information, along with other tracking data, to identify Plaintiff and associate this information with Plaintiff's persistent identity profile and Panorama ID.

149. As deployed on saksfifthavenue.com, the Lotame tracking code captured page views, clicks, and form inputs as Plaintiff submitted them.

150. The tag captured page URLs and content metadata that corresponded to the substance of what Plaintiff was reading and doing on the website, along with behavioral and event-level data batched and transmitted to Lotame's servers roughly every second.

151. At no time did Plaintiff Apaydin consent to Lotame intercepting Plaintiff's communications with saksfifthavenue.com.

152. Plaintiff did not have a direct relationship with Lotame and was unaware of Lotame's presence on the website.

153. The saksfifthavenue.com privacy policy did not identify Lotame as a recipient of user data.

154. Lotame's data collection runs by default upon page load unless the website operator affirmatively configures otherwise, and on information and belief, saksfifthavenue.com did not configure Lotame's optional consent controls or pass Plaintiff's browser privacy signals through to Lotame.

155. Plaintiff therefore had no means of discovering or preventing Lotame's interception, and at no time did Plaintiff consent to Lotame using Plaintiff's personal information for identity resolution, audience classification, or distribution to advertising platforms and data buyers.

156. Lotame subsequently distributed data derived from Plaintiff's intercepted communications to third-party advertising platforms and data buyers through its sync pixels, export beacons, and outbound batch transfers, enabling those parties to target advertisements to Plaintiff based on Plaintiff's browsing activity.

157. Analysis of websites deploying Lotame's tag confirms the operation of its tracking infrastructure.

158. The Lotame Lightning Tag's client identifier corresponds to the website operator's unique Lotame account and transmits collected data to Lotame's collection endpoint at "bcp.crwdcntrl.net/6/data."

159. Each collection request transmitted to Lotame's servers carries the contents of the data object documented in Lotame's reference guides—including behaviors, page-level content metadata such as article titles and tags, any captured identity data, and third-party identifiers—together with Plaintiff's IP address, user-agent, and the URL of the page being visited.

160. The Lotame tag also sets persistent cookies on the crwdcntrl.net domain, including the "_cc_id" identifier cookie, enabling Lotame to recognize and track returning visitors across extended time periods and multiple browsing sessions.

161. The privacy violations Plaintiff Apaydin suffered are not confined to Plaintiff's visits to saksfifthavenue.com but continue to the present day.

162. Lotame's identity graph retains Plaintiff's identity profile, which remains linked (through the deterministic and probabilistic matching techniques described above) to Plaintiff's personal information, content consumption, and browsing activity.

163. This profile continues to be updated each time Plaintiff visits any website in Lotame's network of tracked domains—spanning, on information and belief, thousands of publisher and consumer websites—with each new interaction added to Plaintiff's permanent surveillance record.

164. Plaintiff has no means of accessing, correcting, or deleting this profile, and Lotame provides no consumer-facing mechanism to opt out of its identity resolution system.

165. The information Lotame transmitted to third parties cannot be recalled or deleted by Lotame. Once Plaintiff's data entered the systems of the DSPs, SSPs, ad networks, exchanges, and data buyers to which Lotame distributes audience data, it became incorporated into those parties' user profiles, algorithmic models, and targeting databases.

166. The harm cannot be undone: even if Lotame ceased operations, those third parties would retain Plaintiff's information in their own systems indefinitely, continuing to use it to target advertisements and draw inferences about Plaintiff's characteristics.

167. This ongoing harm flows directly from Lotame's initial interception and disclosure and constitutes a continuing invasion of Plaintiff's privacy.

ii. Plaintiff Checchia.

168. In or around June 2026, Plaintiff Steven Checchia visited the website dicks.com, which deploys Lotame's tracking technology, including its "Crowd Control" (crwdcntrl) pixel. Dick's Sporting Goods is an online sporting goods retailer where consumers create accounts to purchase goods.

169. At various points throughout 2025 and in 2026, Plaintiff Checchia also visited the retail website kohls.com, which likewise deploys Lotame's tracking technology, including its "Crowd Control" (crwdcntrl) pixel, and on which consumers create accounts to purchase goods.

170. While on the Dick's Sporting Goods website, Plaintiff Checchia created a user account—entering personal information including his name and email address—added items to his cart, and completed a purchase, entering payment data to do so. Plaintiff Checchia likewise created a user account on kohls.com—again entering personal information including his name and email address—and completed one or more purchases there, entering payment data to do so.

171. Lotame's tracking technology was deployed and actively operating on the website at the time of Plaintiff Checchia's visits and intercepted the contents of his communications with each website in real time, including his name, his email address, his add-to-cart events, his purchase events, and his payment data.

172. As deployed on dicks.com and kohls.com, the Lotame tracking code captured page views, clicks, and form inputs as Plaintiff Checchia submitted them, captured page URLs and content metadata corresponding to his browsing and purchasing behavior, and captured event-level interactions—including his add-to-

cart and purchase events—batched and transmitted to Lotame's servers roughly every second.

173. Lotame's identity graph then used the intercepted data to identify Plaintiff Checchia and associate this personal information with a persistent identity profile and Panorama ID.

174. Lotame subsequently distributed data derived from this profile to advertising platforms and data buyers through its sync pixels, export beacons, and outbound batch transfers, enabling those parties to target advertisements to Plaintiff based on Plaintiff's browsing and purchasing behavior.

175. Analysis of websites deploying Lotame's tag confirms the operation of its tracking infrastructure.

176. The Lotame tag on each of dicks.com and kohls.com loads from Lotame's tags.crwdcntrl.net endpoint under the operator's unique client identifier, transmits collected data to Lotame's collection endpoint at bcp.crwdcntrl.net, and sets persistent identifier cookies—including "_cc_id"—on the crwdcntrl.net domain, enabling Lotame to recognize and track returning visitors across extended time periods and multiple browsing sessions.

177. At no time did Plaintiff Checchia consent to Lotame intercepting Plaintiff's communications with dicks.com or kohls.com.

178. Plaintiff did not have a direct relationship with Lotame and was unaware of Lotame's presence on the website.

179. The dicks.com privacy policy did not identify Lotame as a recipient of user data or disclose that a third-party data management platform was independently intercepting and profiling users' personal information.

180. The kohls.com privacy policy likewise did not identify Lotame as a recipient of user data or disclose that a third-party data management platform was

independently intercepting and profiling users' personal information.

181. On information and belief, neither dicks.com nor kohls.com configured Lotame's optional consent controls or passed Plaintiff's browser privacy signals through to Lotame.

182. Plaintiff therefore had no means of discovering or preventing Lotame's interception of Plaintiff's communications, and at no time did Plaintiff consent to Lotame using Plaintiff's personal information for identity resolution, audience classification, or distribution to advertising platforms and data buyers.

183. The privacy violations Plaintiff Checchia suffered are not confined to Plaintiff's visits to dicks.com and kohls.com but continue to the present day.

184. Lotame's identity graph retains Plaintiff's identity profile, which remains linked (through the deterministic and probabilistic matching techniques described above) to Plaintiff's personal information, browsing activity, account details, and purchasing history.

185. This profile continues to be updated each time Plaintiff visits any website in Lotame's network of tracked domains, with each new interaction added to Plaintiff's permanent surveillance record. Plaintiff has no means of accessing, correcting, or deleting this profile, and Lotame provides no consumer-facing mechanism to opt out of its identity resolution system.

186. The personal information Lotame transmitted to third parties cannot be recalled or deleted by Lotame.

187. Once Plaintiff Checchia's data entered the systems of the DSPs, SSPs, ad networks, exchanges, and data buyers to which Lotame distributes audience data, it became incorporated into those parties' user profiles, algorithmic models, and targeting databases.

//

188. The harm cannot be undone: even if Lotame ceased operations, those third parties would retain Plaintiff's personal information in their own systems indefinitely, continuing to use it to target advertisements and draw inferences about Plaintiff's consumer behavior and personal characteristics.

189. This ongoing harm—flowing directly from Lotame's initial interception and disclosure—constitutes a continuing invasion of Plaintiff Checchia's privacy.

190. Because Lotame's identity graph links user activity across its entire network of tracked websites, any visit by Plaintiff to any other website where Lotame's tag is deployed would have been captured and appended to Plaintiff's persistent identity profile, enriching Lotame's surveillance record of Plaintiff's browsing behavior, purchasing activity, and personal characteristics without Plaintiff's knowledge or consent.

## CLASS ALLEGATIONS

191. Plaintiffs bring this class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of all members of the following classes (collectively, the "Classes," each the "Class"):

> **Nationwide Class:**
>
> All natural persons located in the United States whose electronic communications with websites were intercepted by Lotame's tracking code and whose identities were captured by Lotame.
>
> **California Sub-Class:**
>
> All natural persons residing in California whose electronic communications with websites were intercepted by Lotame's tracking code and whose identities were captured by Lotame.
>
> **Pennsylvania Sub-Class:**
>
> All natural persons residing in Pennsylvania whose electronic communications with websites were intercepted by Lotame's tracking code and whose identities were captured by Lotame.

192. Excluded from the Classes are the following individuals: officers and directors of Lotame and its parents, subsidiaries, affiliates, and any entity in which Lotame has a controlling interest; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

193. Plaintiffs reserve the right to modify or amend the definition of each of the proposed Classes before the Court determines whether certification is appropriate.

194. Each putative Class satisfies the requirements of Federal Rule of Civil Procedure 23:

a. Each Class is so numerous that joinder of all members is impracticable. Upon information and belief, Class members number in the millions.

b. There are questions of law or fact common to the Classes, including: (1) whether Lotame's tracking code intercepts the contents of electronic communications; (2) whether Lotame's Panorama ID identity graph constitutes identity resolution technology; (3) whether Lotame's practices constitute an invasion of privacy; (4) whether Lotame was unjustly enriched; and (5) whether injunctive relief should issue.

c. Plaintiffs' claims are typical of the claims of the Classes. Plaintiffs and Class members did not consent to Lotame's interception and collection of their communications and personal information.

d. Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs' interests do not conflict with the interests of Class members, and Plaintiffs have retained competent counsel experienced in class action and privacy litigation.

e. Lotame has acted on grounds generally applicable to the Classes, making final injunctive relief and declaratory relief appropriate with respect to the Classes as a whole

//

//

## TOLLING, CONCEALMENT, AND ESTOPPEL

195. The applicable statutes of limitations have been tolled by Defendant's knowing and active concealment and denial of the facts alleged herein.

196. Defendant affirmatively hid its true actions and knowingly made statements that were misleading and concealed the true nature of its conduct and operation.

197. Specifically, Lotame publicly represented that it processes personal data only on the basis of consumer consent, stating, for example, that it "requires consent as the legal basis for all of its processing activities"[42] and marketed its Panorama ID as a privacy-first solution featuring a universal opt-out and compliance with the GDPR, the CCPA, and the IAB Transparency and Consent Framework.[43]

198. These representations were misleading because, as alleged above, Lotame collected and monetized consumers' data without their knowledge or valid consent, while contractually shifting the responsibility for obtaining any consent onto the website operators whose visitors it surveilled.

199. The circumstances and nature of Lotame's data collection would lead reasonable users to believe that Lotame was not collecting their information or that website operators were not facilitating disclosure of the same.

---

[42] *EU ePrivacy Directive and Privacy Choice Signaling Policy*, https://www.lotame.com/legal/policies/eu-consent-policy/ (last visited July 24, 2026) ("Lotame requires consent as the legal basis for all of its processing activities.").

[43] *See Lotame Unveils Panorama ID* (Oct. 28, 2020), https://www.lotame.com/resources/lotame-unveils-panorama-id-the-first-global-cookieless-identity-solution-for-a-privacy-first-open-web/ (last visited July 24, 2026); *Services Privacy Notice*, https://www.lotame.com/privacy/services-privacy-notice/ (last visited July 24, 2026).

200. Moreover, Plaintiffs were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their own part.

201. Furthermore, under the circumstances Defendant was under a duty to disclose the true character, quality, and nature of its activities to Plaintiffs. Defendant therefore is estopped from relying on any statute of limitations.

202. All applicable statutes of limitations also have been tolled by operation of the discovery rule. Specifically, Plaintiffs and other Class members could not have learned through the exercise of reasonable diligence of Defendant's conduct as alleged herein.

203. Accordingly, Plaintiffs and the Class members could not have reasonably discovered the truth about Defendant's practices until shortly before this class litigation was commenced.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT
**18 U.S.C. § 2510, *et seq.***
***(On Behalf of Plaintiffs and the Nationwide Class*****)**

204. Plaintiffs repeat and re-allege all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

205. Plaintiffs bring this claim individually and on behalf of the members of the Nationwide Class against Lotame.

206. The ECPA protects both the sending and receipt of communications.

207. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire, oral, or electronic communication is intercepted.

208. A violation of the ECPA occurs where any person:

> [I]ntentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to

> intercept, any . . . electronic communication [or] intentionally discloses, or endeavors to disclose, to any other person the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication [or] intentionally uses, or endeavors to use, the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication.

18 U.S.C. §§ 2511(1)(a), (c)-(d).

209. "Intercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

210. "Electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

211. "Contents" includes "any information relating to the substance, purport, or meaning" of the communication at issue. 18 U.S.C. § 2510(8).

212. Whenever Plaintiffs and Class members transmitted electronic communications to websites where Lotame's tracking code was installed, Lotame, through the tracking code it deployed on the website, contemporaneously and intentionally intercepted the contents of Plaintiffs' and Class members' electronic communications while those communications were in transmission, and redirected such contents to Lotame's servers and subsequently to third parties through Lotame's sync pixels, export beacons, and outbound data transfers.

213. Lotame intentionally intercepted and used the contents of Plaintiffs' and Class members' electronic communications for unauthorized purposes including

disclosing and, on information and belief, profiting from, Plaintiffs' and Class members' communications by transmitting the contents to third parties for marketing analytics and behavioral targeting purposes.

214. Plaintiffs and Class members did not authorize Lotame to acquire the content of their communications for purposes of sharing the personal information contained therein with advertising platforms and other third parties.

215. Lotame intercepted Plaintiffs' and Class members' electronic communications without authorization or consent, knowing or having reason to know that the electronic communications contained personal information.

216. The intercepted communications include, but are not limited to, communications to/from Plaintiffs and Class members regarding their reading and browsing activity, shopping habits, consumption of media, geolocation, and many more.

217. This confidential information is then added to consumer profiles and monetized for targeted advertising purposes, among other things.

218. By intentionally using, or endeavoring to use, the contents of Plaintiffs' and Class Members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

219. Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy, intrusion upon seclusion, the California Invasion of Privacy Act ("CIPA"), and other state wiretapping and data privacy laws, among others.

220. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

221. The ECPA's crime-tort exception applies where the communication is intercepted for the purpose of a criminal or tortious act independent of the interception itself. *See Caro v. Weintraub*, 618 F.3d 94, 100 (2d Cir. 2010). Here, as alleged above, "[t]he association of Plaintiffs' data with preexisting user profiles is a further use of Plaintiffs' data that satisfies [the crime-tort] exception," because it "violate[s] state law, including the [CIPA], intrusion upon seclusion, and invasion of privacy." *Brown v. Google, LLC*, 525 F. Supp. 3d 1049, 1067 (N.D. Cal. 2021); *see also Marden v. LMND Medical Group, Inc.*, 2024 WL 4448684, at *2 (N.D. Cal. July 3, 2024); *R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 902 (C.D. Cal. 2024).

222. As a direct and proximate result of Lotame's violation of the ECPA, Plaintiffs and Class members were damaged by Lotame's conduct in that:

a. Lotame harmed Plaintiffs' and Class members' interest in privacy;

b. Sensitive and confidential information that Plaintiffs and Class members intended to remain private is no longer confidential;

c. Lotame took something of value from Plaintiffs and Class members and derived benefit therefrom without Plaintiffs' and Class members' authorization, informed consent, or knowledge, and without sharing the benefit of such value; and

d. Lotame's actions diminished the value of Plaintiffs' and Class members' personal information.

223. Plaintiffs, individually and on behalf of the Class members, seek all monetary and non-monetary relief allowed by law, including actual damages,

statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

## SECOND CAUSE OF ACTION

## INVASION OF PRIVACY
## Cal. Const. Art. I § 1
***(On Behalf of Plaintiff Apaydin & the California Sub-Class)***

224. Plaintiff Apaydin brings this claim on behalf of the California Sub-Class.

225. Plaintiff Apaydin incorporates by reference all preceding paragraphs.

226. Article I, Section 1 of the California Constitution provides that all people have inalienable rights including the right to privacy.

227. This constitutional privacy right was added by voters in 1972 specifically to address concerns about "the increasing encroachment on personal freedom and security caused by increasing surveillance and data collection activity." *See White v. Davis*, 533 P.2d 222, 233 (Cal. 1975)

228. Plaintiff Apaydin and the California Sub-Class members maintain a reasonable expectation of privacy in their electronic communications with websites, including communications containing their sensitive personal and financial information.

229. This expectation of privacy is particularly strong with respect to information that consumers intend to share only with the website they are visiting, such as credit card details, purchase history, and personal identifying information.

230. Lotame, in violation of Plaintiff Apaydin's and the California Sub-Class members' reasonable expectation of privacy, intercepts, collects, tracks, and compiles their internet activity and communications, and uses its identity graph to

resolve their identities and create persistent surveillance profiles without their consent.

231. Lotame's conduct is highly offensive to a reasonable person and constitutes an egregious breach of social norms.

232. Lotame secretly intercepts sensitive communications—including personal, financial, and behavioral information—that individuals reasonably expect to remain confidential between themselves and the websites they are visiting, then uses sophisticated technology to identify those individuals and track them across the internet.

233. Plaintiff Apaydin and the California Sub-Class members have been damaged by Lotame's invasion of their privacy and are entitled to just compensation and injunctive relief.

## THIRD CAUSE OF ACTION

## INTRUSION UPON SECLUSION

***(On Behalf of Plaintiffs & the Nationwide Class, or in the alternative on behalf of Plaintiff Apaydin & the California Sub-Class)***

234. Plaintiffs incorporate by reference all preceding paragraphs.

235. To state a claim for intrusion upon seclusion under California common law, a plaintiff must allege (i) intrusion into a private place, conversation, or matter, and (ii) in a manner highly offensive to a reasonable person.

236. Plaintiffs and Class members had an objectively reasonable expectation of privacy in their electronic communications with the websites they visited—including communications containing their personal identifying information, financial information, purchase histories, browsing activity, form submissions, and records of the content they viewed and read, from which sensitive personal characteristics can be inferred.

237. Consumers reasonably expect that the contents of their communications with a website remain between themselves and that website, and that an undisclosed third-party data management platform is not silently intercepting, recording, and profiling those communications in real time.

238. Lotame intentionally intruded upon Plaintiffs' and Class members' private affairs by deploying tracking code that secretly intercepted the contents of their communications with the websites they visited, identified them through Lotame's identity graph and Panorama ID, and compiled persistent surveillance profiles linking their activity across Lotame's network of, on information and belief, thousands of websites.

239. Lotame's data collection runs by default upon page load, its consent and Global Privacy Control mechanisms operate only if separately configured by each website operator, and Lotame provides consumers no notice of its presence and no direct means of refusal—ensuring that Plaintiffs and Class members had no practical means of detecting or preventing the intrusion.

240. Lotame's intrusion was highly offensive to a reasonable person and constitutes an egregious breach of social norms.

241. Lotame covertly intercepted sensitive personal, financial, and behavioral information that Plaintiffs and Class members reasonably expected to share only with the websites they were visiting, operating invisibly under a domain name no reasonable consumer would recognize while defaulting to collection regardless of the privacy preferences those consumers attempted to employ.

242. Lotame then exploited that intercepted information for its own commercial benefit and disclosed it to advertising platforms through Lotame's sync pixels, export beacons, and outbound data transfers, compounding the intrusion.

243. At no time did Plaintiffs or Class members consent to Lotame's interception of their communications, identification through Lotame's identity graph, or disclosure of their information to advertising platforms.

244. As a direct and proximate result of Lotame's intrusion, Plaintiffs and Class members have suffered injury, including loss of privacy, loss of control over their personal information, and the continuing harm of having their personal information disclosed to and retained by third-party advertising platforms in a manner that cannot be undone.

245. Plaintiffs and Class members are entitled to damages, including nominal, compensatory, and punitive damages, as well as injunctive and declaratory relief.

**FOURTH CAUSE OF ACTION**

**VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT**
**Cal. Penal Code § 631**
***(On Behalf of Plaintiff Apaydin & the California Sub-Class)***

246. Plaintiff Apyadin repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

247. Plaintiff Apaydin brings this claim individually and on behalf of the California Sub-Class.

248. CIPA prohibits (i) the interception or procurement of another to intercept any wire, electronic, or oral communication; (ii) the intentional disclosure of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication; and (iii) the intentional use of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was

obtained through the interception of a wire, electronic, or oral communication. Cal. Penal Code § 631(a).

249. At all relevant times, Plaintiff Apaydin was physically located in California when accessing and using saksfifthavenue.com.

250. Plaintiff Apaydin's communications with the websites at issue, including form submissions, input of personal information, and interactions with the websites' interfaces, constitute "electronic communications" within the meaning of CIPA.

251. Through its tracking code and identity graph technology deployed on saksfifthavenue.com, and other websites, Lotame intentionally intercepted Plaintiff Apaydin's electronic communications in real-time as they were transmitted.

252. Lotame's tracking code constitutes a device capable of intercepting electronic communications within the meaning of the CIPA, as it is specifically designed to capture, record, and transmit user interactions and data inputs as they occur.

253. On information and belief, Lotame intercepts communications through electronic devices and servers located in California, and/or intercepted the communications of Plaintiff Apaydin and California Sub-Class members while those users were physically located in California.

254. Lotame's interception of Plaintiff Apaydin's and Sub-Class members' electronic communications was accomplished without their consent. Specifically:

a. Lotame never obtained express consent from Class members before intercepting their communications;

b. Websites where Lotame is present begin tracking users immediately, and some invite users to submit personal information through forms, quizzes, or account-creation flows before they have any opportunity to review any privacy policies;

c. Lotame's tracking and interception begin immediately upon visiting pages where it is present, before any opportunity for users to provide informed consent;

d. Lotame never provided clear, conspicuous notice that users' electronic communications containing personal information would be intercepted and transmitted to Lotame's servers and shared with advertising platforms; and

e. Any purported consent was ineffective because Lotame's interception began before consent could be obtained and because users were never informed of Lotame's role in intercepting their communications.

255. The intercepted communications include highly sensitive personal information that Plaintiff Apaydin and California Sub-Class members provided with reasonable expectations of privacy and confidentiality, including:

a. Email addresses and other personal identifiers;

b. The articles, products, and other content they viewed—including page titles, tags, and categories from which sensitive characteristics, such as financial circumstances, purchasing habits, or political and religious interests, can be inferred;

c. Responses to forms, quizzes, and preference selections;

d. Behavioral and event-level interaction data, including clicks and interactions with page features; and

e. Other personal and financial information including names, addresses, credit card details, and purchase history.

256. Lotame's conduct was willful and intentional, as Lotame deliberately deployed tracking technology knowing it would intercept users' electronic communications without proper consent.

257. As a direct and proximate result of Lotame's violations of CIPA, Plaintiff Apaydin and Sub-Class members have suffered injury, including invasion

of privacy, loss of confidentiality of personal information, and violation of their statutory rights.

258. Plaintiff Apaydin and Sub-Class members continue to desire to use the internet for e-commerce, research, and other purposes but have a reasonable fear that their electronic communications will continue to be intercepted by Lotame without consent.

259. Under Cal. Penal Code § 637.2, Plaintiff Apaydin and Sub-Class members are entitled to:

a. $5,000 per violation;

b. Punitive damages;

c. Reasonable attorneys' fees and other litigation costs reasonably incurred; and

d. Such preliminary and other equitable or declaratory relief as may be appropriate.

260. Unless enjoined by this Court, Lotame will continue to intercept the electronic communications of Plaintiff Apaydin, Sub-Class members, and other website visitors without their consent, causing irreparable harm for which there is no adequate remedy at law.

## FIFTH CAUSE OF ACTION

### VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT
### Cal. Penal Code § 632
***(On Behalf of Plaintiff Apaydin & the California Sub-Class)***

261. Plaintiff Apaydin repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

262. Plaintiff Apaydin brings this claim individually and on behalf of the members of the California Sub-Class against Lotame.

263. California Penal Code § 632(a) provides that "[e]very person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished[.]"

264. California Penal Code § 632(c) defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering or in any legislative, judicial, or other public proceeding in which the public is entitled to attend, or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded."

265. The communications between Plaintiff Apaydin and Sub-Class members and websites where sensitive data is transmitted, such as saksfifthavenue.com, constitute "confidential communications" within the meaning of § 632(c) because:

a. they were made in the context of private consumer transactions and personal browsing involving sensitive personal and financial information;

b. users had a reasonable expectation that their communications with the websites they visited—including personal identifying information, financial details, and records of the content they viewed—would remain confidential;

c. the sensitive nature of the information communicated—including content-consumption records, payment details, and personal identifying information—inherently indicates a desire for confidentiality; and

d. users were not informed that their communications would be recorded and shared with third parties like Lotame.

266. Lotame intentionally used an electronic recording device, including tracking code and identity graph technology deployed on websites including saksfifthavenue.com, to eavesdrop upon and record these confidential communications.

267. Lotame's tracking code constitutes an "electronic amplifying or recording device" within the meaning of § 632(a) because it is specifically designed to capture, record, and transmit user interactions and communications in real-time for analytics and behavioral tracking purposes.

268. Lotame intentionally deployed this recording technology on publisher, e-commerce, and other consumer websites with full knowledge that it would capture and record users' confidential communications, including their personal information, financial details, and records of the content they viewed and read.

269. Lotame's recording of Plaintiff Apaydin's and California Sub-Class members' communications was accomplished without the consent of all parties to the communication, specifically:

a. Plaintiff Apaydin and California Sub-Class members never consented to having their confidential communications recorded by Lotame;

b. Lotame never obtained express consent before recording their communications;

c. Users were not informed that their communications would be recorded and transmitted to Lotame's servers and then shared with third-party advertising platforms and data buyers through Lotame's sync pixels, export beacons, and outbound data transfers;

d. No clear, conspicuous notice was provided regarding the scope and nature of Lotame's recording of confidential communications; and

e. The recording begins immediately upon accessing websites where the Lotame tracking code is installed, before users had any opportunity to review privacy policies or provide informed consent.

270. Lotame's conduct was undertaken intentionally and with knowledge that its tracking code would record confidential communications without proper consent from all parties.

271. The confidential communications that were unlawfully recorded include highly sensitive personal and financial information that individuals provided with reasonable expectations of confidentiality.

272. As a direct and proximate result of Lotame's violations of Section 632, Plaintiff Apaydin and Sub-Class members have suffered harm including invasion of their privacy rights, violation of confidentiality, and loss of control over their sensitive personal information.

273. Unless enjoined and restrained by this Court, Lotame will continue to commit these violations. Plaintiff Apaydin and Sub-Class members have a reasonable fear that their confidential communications will continue to be unlawfully recorded by Lotame.

274. Pursuant to California Penal Code § 637.2, Plaintiff Apaydin and Sub-Class members are entitled to:

a. A preliminary and permanent injunction prohibiting Lotame from continuing its unlawful recording of confidential communications;

b. Statutory damages of $5,000 per violation;

c. Punitive damages for Lotame's willful and egregious violations of privacy; and

d. Such other relief as the Court deems proper.

275. Plaintiff Apaydin and Sub-Class members seek all available remedies under California Penal Code § 632 and related provisions for Lotame's unlawful recording of confidential communications.

## SIXTH CAUSE OF ACTION

## VIOLATION OF THE PENNSYLVANIA WIRETAPPING AND ELECTRONIC SURVEILLANCE CONTROL ACT
## 18 Pa. C.S. § 5701, *et seq*.
## *(On Behalf of Plaintiff Checchia and the Pennsylvania Sub-Class)*

276. Plaintiff Checchia repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

277. Plaintiff Checchia brings this claim individually and on behalf of the members of the Pennsylvania Sub-Class against Lotame.

278. The Pennsylvania Wiretapping and Electronic Surveillance Control Act ("WESCA"), 18 Pa. C.S. § 5701, *et seq.,* prohibits any person from "intentionally intercept[ing], endeavor[ing] to intercept, or procur[ing] any other person to intercept or endeavor to intercept any wire, electronic or oral communication"; from "intentionally disclos[ing] or endeavor[ing] to disclose to any other person the contents of any wire, electronic or oral communication . . . knowing or having reason to know that the information was obtained through the interception of a wire, electronic or oral communication"; and from "intentionally us[ing] or endeavor[ing] to use the contents of any wire, electronic or oral communication . . . knowing or having reason to know[] that the information was obtained through the interception of a wire, electronic or oral communication." 18 Pa. C.S. § 5703.

279. WESCA defines "intercept" as the "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." 18 Pa. C.S. § 5702.

280. "Contents" includes "any information concerning the substance, purport, or meaning of that communication." *Id.*

281. "Electronic communication" means "any transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system." *Id.*

282. WESCA is an all-party consent statute: an interception is lawful only "where all parties to the communication have given prior consent to such interception." 18 Pa. C.S. § 5704(4).

283. There is no "direct-party" exception to civil liability under WESCA for a third-party company that intercepts website communications through tracking code embedded in a website. *Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121, 130–31 (3d Cir. 2022).

284. Under *Popa*, the interception occurs at the point where the tracking code redirects the contents of the user's communications, i.e., at the user's browser, in Pennsylvania, regardless of where the intercepting company's servers are located. *Id.* at 131–33.

285. The communications between Plaintiff Checchia and Pennsylvania Sub-Class members, on the one hand, and the websites they visited, on the other—including, in Plaintiff Checchia's case, his communications with dicks.com and kohls.com containing his name, email address, add-to-cart events, purchase events, and payment data—are "electronic communications" within the meaning of 18 Pa. C.S. § 5702.

286. Lotame intentionally intercepted, endeavored to intercept, and procured the interception of the contents of those communications through its Lightning Tag and crwdcntrl tracking pixel, which acquired the contents of Plaintiff Checchia's and Pennsylvania Sub-Class members' communications contemporaneously with their

transmission and redirected them to Lotame's servers. The interceptions occurred at Plaintiff Checchia's and Pennsylvania Sub-Class members' browsers while they were located in Pennsylvania.

287. Lotame's tracking code constitutes an "electronic, mechanical or other device" within the meaning of 18 Pa. C.S. § 5702.

288. Neither Plaintiff Checchia nor any Pennsylvania Sub-Class member consented to Lotame's interception of their communications, much less gave the "prior consent" of all parties that WESCA requires.

289. Lotame's data collection runs by default upon page load; Lotame never sought or obtained consent from Plaintiff Checchia or Pennsylvania Sub-Class members; and, on information and belief, the websites they visited did not configure Lotame's optional consent controls or pass users' browser privacy signals through to Lotame.

290. Lotame thereafter disclosed and used the contents of the intercepted communications—feeding them into its identity graph and distributing identity-resolved audience data to advertising platforms and data buyers—knowing or having reason to know that the information was obtained through the interception of electronic communications in violation of WESCA.

291. Pursuant to 18 Pa. C.S. § 5725(a), Plaintiff Checchia and the Pennsylvania Sub-Class are entitled to: (i) actual damages, but not less than liquidated damages computed at the rate of $100 a day for each day of violation, or $1,000, whichever is higher; (ii) punitive damages; and (iii) reasonable attorneys' fees and other litigation costs reasonably incurred.

292. Unless enjoined by this Court, Lotame will continue to intercept the electronic communications of Plaintiff Checchia, Pennsylvania Sub-Class members,

and other website visitors without the consent of all parties, causing irreparable harm for which there is no adequate remedy at law.

## SEVENTH CAUSE OF ACTION

### Unjust Enrichment
***(On Behalf of Plaintiffs and the Nationwide Class)***

293. Plaintiffs incorporate by reference all preceding paragraphs.

294. Lotame has wrongfully and unlawfully intercepted and used Plaintiffs' and Class members' personal information, including their identifiers, purchase histories, and browsing activity, for commercial gain without consent.

295. Plaintiffs and Class members conferred a benefit upon Defendant by providing valuable information, including purchase histories, browsing histories, content-consumption records, and personal identifiers, through their use of websites where Lotame is active.

296. Plaintiffs' and Class members' personal information has conferred an economic benefit on Lotame. Lotame has profited by using intercepted data in its identity graph and by sharing identity-resolved consumer profiles with advertising platforms through Lotame's sync pixels, export beacons, and outbound data transfers.

297. It would be inequitable and unjust for Lotame to retain any proceeds from its unlawful conduct. Plaintiffs and Class members are entitled to restitution and disgorgement of all revenues, earnings, profits, and other benefits obtained by Lotame as a result of its unlawful conduct.

//

//

//

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Nicki Apaydin and Steven Checchia, individually and on behalf of all others similarly situated, respectfully request that this Court enter judgment against Defendant Lotame Solutions, Inc. and in favor of Plaintiffs and the Classes, and grant the following relief:

A. Certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. Appoint Plaintiffs as Class Representatives;

C. Appoint undersigned counsel as Class Counsel;

D. Enter judgment in favor of Plaintiffs and Class members against Lotame awarding damages, including statutory damages, punitive damages, and nominal damages;

E. Enter judgment in favor of Plaintiffs and Class members awarding restitution and disgorgement of Lotame's revenue obtained through unlawful tracking;

F. Enter a declaratory judgment that Lotame's conduct violates the laws alleged herein;

G. Permanently restrain Lotame from intercepting, tracking, collecting, or compiling the personal information of Plaintiffs and Class members without consent;

H. Award Plaintiffs and Class members their reasonable costs and expenses, including attorneys' fees;

I. Grant such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: August 25, 2026

Respectfully Submitted,

*/s/ Victor J. Sandoval*

Victor J. Sandoval (SBN 344461)
**ALMEIDA LAW GROUP LLC**
3415 S. Sepulveda Blvd. Suite 1121
Los Angeles, California 90034
(562) 534-5907
victor@almeidalawgroup.com

*Counsel for Plaintiffs and the Putative Classes*